IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

PAMELA D. WILLIAMS, et al.,                     Case No.: 2:10-CV-00394
                                                Judge James L. Graham
            **Plaintiffs**                      Mag. Judge Terrence P. Kemp

v.

NEW DAY FARMS, LLC, et al.,

            **Defendants.**

### OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS NEW DAY FARMS, LLC AND DAYBREAK FOODS, INC.

Plaintiffs Pamela Williams (Williams) and Northwest Neighborhood Alliance (NNA) filed this action against Defendants New Day Farms, LLC (New Day), Daybreak Foods, Inc. (Daybreak) (collectively the "egg defendants"), Ohio Department of Agriculture (ODA) Livestock Inspector Chris Rodabaugh (Rodabaugh) and various John Does.

This action arises out of a an earlier lawsuit filed by New Day against Williams, NNA and the York Township Board of Trustees, New Day Farms, LLC v. Board of Trustees of York Township Ohio, et al., Case No. 2:08-cv-01107 (New Day I). In New Day I, New Day alleged that Williams and NNA conspired with public officials to pass an illegal fire safety code for the sole purpose of discriminating against New Day's egg farm and its Spanish-speaking employees. By order dated November 17, 2009 the court dismissed Williams and NNA from New Day I, finding that they were entitled to immunity under the *Noerr-Pennington* doctrine because they had simply exercised their first amendment right to petition their government to oppose the construction of additional egg farms in their neighborhood. (New Day I doc. 57). The court further found that New Day had failed to state a claim against NNA or Williams under either 42

1

U.S.C. §1983 or §1985.  New Day's appeal of this court's decision in New Day I remains

pending.

In the instant action (hereinafter referred to as New Day II), Williams and NNA allege that

the egg defendants brought the earlier lawsuit solely as means to silence their opposition to egg

farms.  They further allege that the egg defendants conspired with the ODA to infringe on their

constitutional right of free speech and to petition by limiting their ability to speak out against the

egg farms.

**I.      FACTS**

Plaintiff Pamela Williams (Williams) is a resident of York Township, Ohio. In late 2007,

Williams learned that an entity called Hi-Q Egg Products, LLC (Hi-Q) wanted to create a new

egg farm in York Township that would bring an additional (6) million chickens within two miles

from Williams' home. Defendant New Day was already operating a poultry and egg farm in

York Township. New Day is owned by Daybreak.  On March 5, 2008 Williams and two other

neighbors, who were also concerned about the additional chickens, formed the plaintiff

Northwest Neighborhood Alliance (NNA), an Ohio non-profit corporation, to speak out against

the egg farms. Williams and NNA had concerns over the smell that would be caused by the

additional chickens and their manure, the environmental impact that these chickens would have

on the community, and the combined effect of these problems on the value of local properties.

The goal of NNA was to stop the location of the six million additional chickens in such close

proximity to Williams' and her neighbors' homes. In order to achieve this goal, NNA and

Williams wrote letters to the editor, spoke to elected representatives, attended township

meetings, and printed and posted signs.

2

At the February 27, 2008 York Township trustees meeting, a trustee suggested that York Township adopt a fire safety code. The fire code was eventually adopted on June 2, 2008. Prior to the adoption of the fire code, New Day had applied for and been given a permit for renovations to their existing egg farm by the Ohio Department of Agriculture (ODA). However, after adoption of the code, New Day was served by the York Township Board of Trustees with a cease and desist letter informing New Day that it was in violation of the new fire code regulations. (New Day II doc. 14-10).  Although Williams and NNA supported the adoption of the code, they did not have any involvement in its drafting, enforcement or implementation. Williams and NNA did, however, continue to speak out publicly against New Day's proposed farm additions and the Hi-Q farm.

On August 7, 2008, New Day and Hi-Q held a public informational meeting for the purpose of answering questions from the public regarding the chickens and the proposed and existing egg farm operations. Hi-Q rented one half of the event space for the meeting while NNA rented the other half for the same date. On their side of the room, NNA had posted signs stating "No More Chicken Factories."  When a crowd of nearly 400 people arrived, Hi-Q and NNA agreed to join their respective rental spaces into one large room. Egg defendants and Rodabaugh, along with the Executive Director of the ODA Livestock Environmental Permitting Program, Kevin Elder, attended this informational meeting. At that time[1], Rodabaugh was an ODA livestock inspector assigned to northwestern Ohio, including Union County. As part of his official duties, Rodabaugh conducted routine inspections of permitted facilities within his territory, including New Day's egg farm. Rodabaugh was also tasked with responding to citizen complaints about the various farms. Between August 2008 and March of 2009, Rodabaugh and

---

[1]        Rodabaugh retired from the ODA on December 31, 2010. (New Day II doc 39-1 ¶5).

3

the ODA received over thirty (30) complaints related to New Day's egg farm operations and particularly the odor emanating therefrom.

Due to significant public interest in the Hi-Q egg farm proposal, the ODA scheduled a public informational meeting for December 17, 2008.  In an email dated November 3, 2008, sent by New Day supervisor Mark Myers to ODA Executive Director Elder, Myers stated that Rodabaugh had made plans to limit the participation of any egg farm opponents. The email stated, in pertinent part:

> Chris [Rodabaugh] also said Karen's Event Center in Marysville was the intended location, the same place Hi-Q had their session a few months ago. *Chris said the plan was to rent both large rooms and use only one to limit the opposition from posting their propaganda.* The Event Center has a third smaller room too that will hold about 25 people, just a nice size for a wedding rehearsal dinner or the like. I think the rental for the real small room is $100. If you do not want to add that to the ODA costs, let me know. *I will rent it myself to keep the opposition out. Tie up the whole place.* . . I am personal friends with Bob and Karen Paver, the owners of the Event Center. *I'll bet I can get them to agree to stop even signs being posted outside on their property too.*
> (New Day II doc. 1-4) (emphasis added).

Myers also forwarded the message to Rodabaugh. The following day, Rodabaugh emailed Myers and New Day General Manager Steve Bliesner informing them that the ODA December 17th informational meeting would be held at a school. Myers responded to Rodabaugh with concern, noting "that may be a problem since the rest of the school cannot be tied up for the opposition." Id. According to plaintiffs, these emails are evidence that Rodabaugh, Elder and the egg defendants had conspired to create a plan to silence the opposition like NNA and Williams. Plaintiffs also assert that Rodabaugh's conduct as an ODA inspector is evidence of a symbiotic relationship that the state had with New Day.  Plaintiffs allege that Rodabaugh purposefully ignored or downplayed complaints of odors coming from the egg farm.  (New Day I doc. 76-8,

Rodabaugh email stating that some odor complaints may be reactionary to Hi-Q's egg farm

expansion; see also, Rodabaugh depo New Day I doc. 76, p. 157, admitting he was skeptical

about the validity of at least one complaint).

 Shortly after the email exchange between ODA and New Day, and before the December

17, 2008 meeting, New Day filed New Day I.  After being dismissed from New Day I, NNA and

Williams filed the present action against New Day, Daybreak, Chris Rodabaugh, and John Does

1-10 on May 3, 2010.  In this action, plaintiffs bring claims against the egg defendants for

malicious prosecution, abuse of process, and conspiracy in violation of 42 U.S.C. §1983 and 42

U.S.C. §1985.  Plaintiffs seek attorney fees pursuant to 42 U.S.C. §1988, damages, and

injunctive relief.

## II. Legal Standard

 Under Fed. R. Civ. P. 56(C), summary judgment is proper "if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of law." See

Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden

of proving the absence of genuine issues of material fact and its entitlement to judgment as a

matter of law, which may be accomplished by demonstrating that the nonmoving party lacks

evidence to support an essential element of its case on which it would bear the burden of proof at

trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424

F.3d 481, 485 (6th Cir. 2005).

 The "mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

### III.    Legal Analysis

####    A.    Whether Daybreak is a proper party.

New Day's parent company, Daybreak, asserts that summary judgment in its

favor is proper because, "a parent corporation is not liable for the actions of its subsidiary."

(New Day II doc. 14, *citing* <u>Starner v. Garner Indus.,</u> 143 Ohio App. 3d 461, 468 (Ohio Ct. App.

2001)). While this is generally true, the corporate entity may be "disregarded and its subsidiary

may be treated as a single entity under certain circumstances," <u>Corrigan v. USX Corp.</u>, No. 1:03

CV 1835, 2005 U.S. Dist. LEXIS 46783 (N.D. Ohio Oct. 14, 2005), such as where the subsidiary

is "'so dominated and controlled' by the parent that it has no more than a paper existence." <u>Id</u>

(citing <u>In re Cardinal Health Inc. ERISA Litigation</u>, 225 F.R.D. 552, 557 (S.D. Ohio 2005)).

Factors considered in determining whether to disregard the corporate entity include: provision of

capital by the parent, purchase of supplies by the parent, undercapitalization of the subsidiary,

overlapping directors and officers, payroll, profits of subsidiaries.  <u>See,</u> <u>Precision, Inc. v.</u>

<u>Kenco/Williams, Inc</u>., 66 Fed. Appx. 1, 12 (2003) (citing <u>Herman v. Mobile Homes Corp.</u>, 26

N.W. 2d 757 (Mich. 1947)

Plaintiffs cite to various factors which they argue support disregarding the corporate

entity: New Day and Daybreak share a corporate address, Daybreak's CEO William Rehm is the

designated representative for New Day for purposes of this action, and Rehm testified that New

Day and Daybreak are "one and the same." (Rehm Depo p. 86-87, New Day I doc. 96).

Daybreak has not responded to any of the facts alleged by the plaintiffs.  Daybreak has not

responded to any of plaintiffs' arguments for why Daybreak is a proper party, thus the present

record is insufficient to support summary judgment in favor of Daybreak.

### B.        Strategic Litigation Against Public Participation ("SLAAP") Lawsuits

The plaintiffs refer to New Day I as a "SLAAP" (Strategic Litigation Against Public Participation) suit.  The purpose of a "SLAAP" suit is to "retaliate against political opposition, attempt to prevent future opposition and intimidate political opponents, and [is] employed as a strategy to win an underlying economic battle, political fight, or both. . . the goal is not necessarily to win the lawsuit, but rather to deter public participation in the democratic process by chilling debate on public and political issues." Tri-County Concrete Co. v. Uffman-Kirsch, No. 76866, 2000 Ohio App. LEXIS 4749 (Ohio Ct. App. Oct. 12, 2000). While several states specifically recognize "SLAAP" suits by state legislation, Ohio does not have any anti-SLAAP legislation at this time.

Defendants urge the court to dismiss this action on the grounds that the Ohio does not recognize anti-SLAAP lawsuits.  They argue that plaintiffs' complaint "invites the Court to usurp the role of the Ohio General Assembly and legislate a new cause of action under Ohio law." (doc. 14).  The egg defendants misread plaintiffs' complaint.  Although the plaintiffs refer to New Day I as a SLAAP lawsuit, they are not seeking relief under any anti-SLAAP legislation or proposing a new Ohio anti-SLAAP cause of action.

Plaintiffs have specifically disavowed any attempt to state any "anti-SLAAP claim under Ohio law. Plaintiffs' complaint asserts only recognized causes of action under Ohio and federal law: malicious prosecution, abuse of process, and civil rights claims.  Plaintiffs themselves say that the egg defendants' argument that the complaint must be dismissed on the grounds that it attempts to state an anti-SLAAP suit is nonsensical "in that they attack a cause of action not asserted." (doc. 23).  Since plaintiffs specifically disavow such a claim, this court is not called

8

upon to determine whether Ohio would recognize an anti-SLAAP lawsuit on public policy or other grounds.

### C.    Malicious Civil Prosecution

A cause of action for malicious prosecution in Ohio has four elements:

(1) malicious institution of prior proceedings against the plaintiff by defendant, (2) lack of probable cause for the filing of the prior lawsuit, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings.

Robb v. Chagrin Lagoons Yacht Club, 662 N.E.2d 9, 13 (Ohio, 1996) (quoting Crawford v. Euclid Natl. Bank 483 N.E.2d 1168, 1171 (Ohio 1985). Ohio courts continue to require seizure of property in malicious civil prosecution cases. See, Stull v. Perrysville , No. 01 COA 01398, 2001 Ohio 1551 (Ct. App. Ohio September 14, 2001)("we believe that the interests of justice and economy are best served by continuing to require the element of seizure of property in malicious civil prosecution cases"). The court need not address whether the first three elements have been met in this case, because it is clear that the fourth element, seizure of property, has not been met.

The plaintiffs do not allege that egg defendants seized their property. Rather, they allege that the egg defendants attempted to infringe on the plaintiffs' first amendment liberties. Plaintiffs argue that first amendment liberties are a property interest and cite State v. Brown, 1994 WL 716324 (Ct. App. Ohio 1994) in support of this proposition. In Brown, the court quoted Terry v. Ohio, 392 U.S.1, 19 (1968), which held that "a seizure of the person occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."

Plaintiffs assert that the defendants seized their fundamental liberty of free speech

9

and therefore, a seizure occurred. Plaintiffs' argument is not persuasive. The quote upon which

they rely must be viewed in the context of the cases in which it is first set forth. Both <u>Brown</u> and

<u>Terry</u> were criminal cases involving fourth amendment search and seizure issues and "the

damages from being sued civilly are of a different character than from being arrested or haled

into court on a criminal charge." <u>Stull</u>, 2001 Ohio 1551. Neither <u>Terry</u> nor <u>Brown</u> provides a

basis for concluding that the silencing of speech constitutes a seizure of a person's liberty.

Plaintiffs have cited no cases in which the required seizure element of a malicious civil

prosecution is met by allegations of infringement on First Amendment rights. Accordingly, the

court finds that plaintiffs have failed to offer any evidence in support of one of the essential

elements of a claim for malicious civil prosecution and therefore the court grants summary

judgment on this count in favor of the defendants.

### D. Abuse of Process

"One who uses a legal process, whether criminal or civil, against another primarily to

accomplish a purpose for which it is not designed, is subject to liability to the other for harm

caused by the abuse of process."  Restat 2d of Torts, § 682.  Under Ohio law, an abuse of process

claim contains three elements:

> (1) that a legal proceeding has been set in motion in proper form and with probable
> cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior
> purpose for which it was not designed; and (3) that direct damage has resulted from the
> wrongful use of process.

<u>Chagrin Lagoons Yacht Club,</u> 662 N.E.2d at 15.  "In an abuse of process case, 'the improper

purpose usually takes the form of coercion to obtain a collateral advantage, not properly

involved in the proceeding itself, such as the surrender of property or the payment of money, by

the use of the process as a threat or a club.'" <u>Id</u> (quoting Prosser & Keeton on Torts, (5 Ed.

10

1984), 898, Section 121). Thus, abuse of process occurs when "someone attempts to achieve through use of the court that which the court is itself powerless to order." Id; Frackelton v. Swanson, No. 41921, 1980 Ohio App. LEXIS 10366 (Ct. App. Ohio Oct. 16,1980) (an action is considered an abuse of process "where process, once obtained for whatever reason, is willfully perverted to accomplish an end not lawfully available by such process"). The tort of abuse of process is a "distinct tort in its own right, distinguishable from the tort of malicious civil prosecution," and unlike malicious civil prosecution, "seizure of person or property is not an element of the tort of abuse of process." Yaklevich v. Kemp,Schaeffer & Rowe Co., L.P.A. 626 N.E.2d 115, 118, fn.3 (Ohio, 1994) (citations omitted).

The evidence establishes that there is a material question of fact as to whether the egg defendants should be liable for abuse of process. Plaintiffs allege that egg defendants "used the legal process for an ulterior motive, specifically, to silence their critics and inflict emotional distress on Williams, NNA and Does 1-5." (New Day I doc 1¶ 101). The court believes that the the Restatement of Torts best articulates the gist of an abuse of process claim: "one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Restat 2d of Torts, § 682. The plaintiffs have sufficiently alleged, and provided evidence in support of their contention, that the defendants instituted a lawsuit that was lawfully served upon plaintiffs, in an attempt to use the court to do something the court could not otherwise do. Specifically, plaintiffs have at least raised an issue of fact as to whether New Day pursued New Day I against Williams and NNA, not for the legitimate purpose of having this court declare the fire code illegal, but rather for the ulterior purpose of silencing the First

11

Amendment speech of the plaintiffs.  The court is aware of Ohio case law which lists "probable cause" for the first law suit as an element of an abuse of process claim. See Chagrin Lagoons Yacht Club, 662 N.E.2d at 15.  Probable cause is not defined in Chagrin, although at least one Ohio case defines it as "a reasonable ground of belief, supported by trustworthy information and circumstances known to the defendant which  would be sufficiently strong to cause a reasonably careful person, under similar circumstances, to believe that the prior proceedings and method of presenting the action were reasonable and lawful." Donohoe v. Burd, 722 F. Supp. 1507, 1517 (S.D. Ohio 1989).   Although plaintiffs have not specifically used the term "probable cause," the defendants raise an issue of fact because they assert that they brought the lawsuit with probable cause and for the legitimate purpose of protecting its own property rights which were allegedly threatened by the enactment of the fired code.  A reasonable jury could find that at the time New Day filed New Day I, it had a reasonable ground of belief that Williams and NNA had some influence on the enactment of the fire code. A reasonable jury could also find that though lawfully brought against plaintiffs, New Day I was used by the defendants to secure the silence of critics of its egg farms.

There is also a question of fact with regards to whether the defendants' alleged abuse of the legal system for an ulterior motive caused plaintiffs' damages.  According to plaintiffs, being named as defendants in New Day caused significant damage.  Williams asserts that prior to New Day I, she was comfortable doing various free-speech related activities in opposition to the egg farms, including attending city council meetings, writing letters to the editor of newspapers, preparing example letters for her neighbors to use, making complaints to the ODA, and offering "No More Chicken" signs door to door.  (New Day I doc. 23-3).  Prior to New Day I, NNA

12

maintained a current website with information on meetings and contained sample documents for supporters to use to send to politicians and political bodies.  (Id).  Pre-New Day I, the NNA also actively encouraged officials and candidates to write articles about the egg farms which NNA published as paid advertisements. (Id). After New Day I was filed, Williams avers that she suffered nightmares, anxiety, stress, and concern that New Day's allegations in New Day I that she was racist would negatively impact her job as a U.S. Postal Worker. (Id). Williams further avers that after New Day I was filed, NNA stopped its paid advertisements, stopped distributing signs door to door, stopped updating the NNA website and stopped speaking out freely to neighbors and political entities. (Id).  In rebuttal, the defendants cite to various documents, including emails from Williams, which they allege are evidence that New Day I had no impact on the free speech of either Williams or the NNA. (see exhibits attached to New Day II doc 40). Therefore, there remains a question of fact on the third element which cannot be resolved on summary judgment.

Accordingly, defendants' motion for summary judgment on plaintiffs' abuse of process claim is denied.

### E.      42 U.S.C. §1983 Conspiracy Claim

In order to establish a claim for a 42 U.S.C. §1983 civil conspiracy claim, plaintiff must come forward with factual allegations showing: 1) the existence of a conspiracy and 2) an actual deprivation of a right secured under the Constitution by persons acting under the color of state law. BPNC, Inc. v. Taft, 3:02-CV-7620, 2003 U.S. Dist. LEXIS 10702 (N.D. Ohio, June 18, 2003) (there must be specific factual allegations showing the existence of the conspiracy, as

well as allegations that the conspiring defendants acted with the specific intent to deprive the plaintiff of equal protection of the law).

1.      Existence of a conspiracy

A "civil conspiracy is an agreement between two or more persons to injure another by unlawful action. A plaintiff alleging conspiracy must show that there was a single plan, that the alleged conspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury." Pillette v. Detroit Police Dep't, 661 F. Supp. 1145, 1148 (E.D. Mich. 1987)(citing Hooks v. Hooks, 771 F.2d 935 (6th Cir. 1985)). Conspiracy claims "must be pled with some specificity: vague and conclusory allegations that are unsupported by material facts are not sufficient to state a section 1983 claim." Farhat v. Jopke, 370 F.3d 580, 599 (6th Cir. 2004).

Plaintiffs argue that the egg defendants acted under color of state law by conspiring with the ODA, through co-defendant Rodabaugh and Elder[2], to silence plaintiffs' political speech in violation of the First Amendment. Plaintiffs cite the emails from Mark Meyer to Elder and Rodabaugh about limiting the opposition's access to the ODA informational meeting. (New Day II doc. 1-4). Although they deny having any such "plan," both Rodabaugh and Elder have testified that they recognized that the "opposition" referred to would be anyone opposed to the expansion of the egg farm, including Williams and NNA. (New Day I doc. 71 p. 257, 292; New Day I doc. 76, p. 176-177). In addition, plaintiffs provide evidence of what could be construed as Rodabaugh, and perhaps the ODA's, reticence in responding to citizen complaints about egg

_____

[2]      Elder is not named in the complaint and plaintiffs do not seek injunctive relief against Elder or the ODA itself.

farm odors. In his deposition, Elder testified that it was his belief that the odor complaints from citizens regarding New Day's farm were driven by fear of Hi-Q's proposed expansion and were therefore not legitimate complaints. (New Day I doc. 71 p. 255). Rodabaugh testified that he believed that the citizen complaints increased after the Hi-Q meeting, that some false complaints were being made in response to the Hi-Q proposal and that he was skeptical of some of the complaints. (New Day I doc. 76, pp. 144-145; 156-157).

Although plaintiffs have provided evidence that New Day may have believed there was a "plan" between ODA and itself to limit the opposition to the egg farm proposals at the December 17, 200 meeting, there is no evidence that such a plan existed or that the ODA acted upon any such plan. Indeed the ODA chose to have the meeting at a school building which negated any such plan. Defendants have established that Rodabaugh or other ODA inspectors responded to all citizen complaints.[3] (See e.g. New Day II docs. 76-4 through 76-12). The fact that Rodabaugh did not confirm any odors on certain occasions does not in and of itself prove that he was downplaying the citizen complaints pursuant to agreement with the egg defendants. Rather, as noted in his reports, wind patterns have an effect on the detectable odors and this could be responsible for Rodabaugh's conclusions that there were no excessive odors. In any event, any conspiracy to minimize citizen complaints about odor has no effect on plaintiffs' freedom of speech.

There is no evidence that the egg defendants had any actual input in scheduling the December 17th ODA informational meeting. (see Elder Affidavit at New Day II doc. 40-20, ¶3,

---

[3] At some point the ODA had determined the source of the odor at the New Day farm and stopped investigating complaints related to a particular odor source. (New Day I doc. 71 p. 263).

the "ODA alone selected the location, date, place, time, format and funding of the open house and the public hearing"). Although the egg defendants wanted it held at the Event Center so they could limit the opposition's access to the meeting, the ODA scheduled the meeting at the high school which could not, in fact, be tied up to prevent the opposition from attending. In addition, there is simply no evidence that the ODA conspired at any time to have New Day file the original lawsuit against NNA or Williams. Accordingly, there is no genuine issue of material fact with regards to the existence of a conspiracy.

>    **2.     An actual deprivation of a right secured under the
>              Constitution by persons acting under the color of state law.**

Even if there were evidence of a conspiracy, the plaintiffs would also have to come forward with factual allegations showing that the egg defendants were acting under the color of state law at the time of the alleged conspiracy. This they cannot do. A defendant's actionable conduct is under color of state law when the defendant possessed the power to act by virtue of state law and misused that power to deprive plaintiffs of a federal right. Beamer v. Bd. of Coshocton County Comm'rs, No. 2:07-cv-00067, 2008 U.S. Dist. LEXIS 14262 (S.D. Ohio, Feb. 26, 2008) (citing Cassady v. Tackett, 938 F.2d 693, 695 (6th Cir. 1991)). However, "in order to hold a private entity liable under 42 U.S.C. §1983, the plaintiff must show that his conduct is fairly attributable to the state, that is, that his conduct is "state action." Kerans v. Porter Paint Co., 656 F. Supp. 267, 269 (S.D. Ohio 1987)(citing Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937, 102 S. Ct. 2744 (1982)). The Sixth Circuit uses three tests to determine whether a private entity is a state actor: (1) the state compulsion test; (2) the symbiotic relationship or substantial nexus test; and (3) the public function test. See, Wolotsky v. Huhn,

960 F.2d 1331, 1335 (6th Cir. 1992). The plaintiffs do not specify under which test this court should evaluate whether the egg defendants were state actors.

### a.  State Compulsion Test

"If the state exercises 'such coercive power or provide[s] such significant encouragement, either overt or covert' over a private entity's actions, by law, those actions are ascribed to the state." Probst v. Cent. Ohio Youth Ctr., 511 F. Supp. 2d 862, 867 ( S.D. Ohio 2007) (quoting Wolotsky, 960 F.2d at 1335). The state agency must do more than simply approve of the private actor's conduct. Rather, it must so coerce or encourage a private entity to act "that the choice of that entity must be regarded as the choice of the state itself." Daniels v. Retired Senior Volunteer Program, No. 2:05-cv-0114 ,2006 U.S. Dist. LEXIS 16999 (S.D. Ohio Mar. 27, 2006) (citations omitted). "Coercion or encouragement perpetrated by the state typically takes the form of action undertaken by the state that compels a private entity to act in a particular way." Id.

There is no allegation in the complaint, nor is there any evidence submitted by the plaintiffs, to suggest that the state coerced or compelled the moving defendants to silence the first amendment rights of the plaintiffs. There is no evidence that the ODA coerced or compelled the egg defendants to seek ways to limit the opposition's access to the informational meetings and there is also no evidence that the ODA coerced or compelled the egg defendants to file the New Day I suit. Thus, New Day and Daybreak are not state actors under the state compulsion test.

### b.  The symbiotic relationship or substantial nexus test.

"Under the symbiotic relationship or nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action

of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." Wolotsky, 960 F.2d at 1335 (citing Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352, 95 S. Ct. 449 (1974)). In order for there to be a symbiotic relationship, "it must be demonstrated that the state is intimately involved in the challenged private conduct." Id (citing Bier v. Fleming, 717 F.2d 308, 311 (6th Cir. 1983)). A sufficiently close nexus may be found to exist where "the private actor has exercised powers 'traditionally the exclusive prerogative of the state,'. . . or where the state has exerted coercive power or 'significant encouragement' with regard to the particular challenged private conduct." Kerans v. Porter Paint Co., 656 F. Supp. 267, 270 (citing Jackson, 419 U.S. at 353; Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S. Ct. 2777 (1982)). Although no clear standard exists to identify a "sufficiently close nexus," several factors have been deemed *insufficient*, including: the mere presence of state regulation, even if extensive; public funding or the private use of public property; the presence of a minority of public officials on the board of a private entity; the state's acquiescence or approval of a private activity; and a private actor's use of public services. Farmer v. Pike County Agric. Soc'y, No. 2:05-cv-0664, 2006 U.S. Dist. LEXIS 32832 (S.D. Ohio May 24, 2006) (citing Lansing v. City of Memphis, 202 F.3d 821, 829 (6th Cir. 2000)(quoting Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992))).

Plaintiffs allege that the egg defendants were permitted to exercise powers traditionally reserved to the state when they were able to plan and conspire to keep out the opposition from the ODA public informational meeting. Although plaintiffs may have provided evidence that the moving defendants believed, whether rightfully or not, they had the ability to influence the ODA in setting the informational meeting, the fact is that the meeting was not held at the time

18

or location that the moving defendants wanted. Rather, it was held at the school – a fact which caused Meyer concern because it would be more difficult to keep out the opposition. (New Day II doc. 1-4). Even if the moving defendants were led to believe that the ODA was on their side of the issue, there is no evidence that they were permitted to exercise powers generally limited to the state. Thus, the egg defendants are not state actors under the symbiotic relationship test.

Moreover, there is absolutely no evidence that New Day or Daybreak had any input on the ODA's investigation of the citizen complaints. As stated *supra*, the ODA responded to complaints, even if they believed that some of them were false. Thus, there is no genuine issue of material fact that would allow a jury to conclude that the egg defendants were state actors under the nexus/symbiotic relationship test.

Finally, there is no evidence that any officer or employee of the State of Ohio had any role in the egg defendants' decision to file and prosecute New Day I which was the principal activity plaintiffs' point to in alleging that their first amendment rights were infringed.

### c. Public Function Test

Under the public function test, the question is whether the private entity "exercises powers which are traditionally exclusively reserved to the state." Riester v. Riverside Cmty. Sch., 257 F. Supp. 2d 968, 971 (S.D. Ohio 2002) (internal citations omitted). The "threshold is high for a private actor to meet the public function test and the Sixth Circuit interprets the public function test narrowly." Bowersock v. City of Lima, No. 3:07 CV 730, 2008 U.S. Dist. LEXIS 31480 (N.D. Ohio Apr. 16, 2008) (citing Chapman v. Higbee Co., 319 F.3d 825, 833 (6th Cir. 2003)).

Plaintiffs do not specifically address the public function test, however, there is no allegation or evidence that would support a finding that the egg defendants were state actors under this test. The egg defendants did not exercise any power "traditionally reserved to the state." There is no evidence that the egg defendants were permitted to plan the ODA informational meeting. There is no evidence that the egg defendants were responsible for or integral in responding to citizen complaints to the ODA. Accordingly, egg defendants are not state actors under the public function test. Compare, Riester v. Riverside Cmty. Sch., 257 F. Supp. 2d 968 (S.D. Ohio 2002) (defendant private entity that provides free, public education is a state actor under the public function test).

Plaintiffs have not raised a genuine issue of material fact that would lead a jury to conclude that the egg defendants were state actors.

**F.     42 U.S.C. §1985 (3)**

42 U.S.C. §1985 prohibits conspiracies interfering with civil rights. To state a claim for relief under 42 U.S.C. §1985(3), a complaint must allege that defendants "1) conspired 2) for the purpose of depriving any person or class of the equal protection of the laws, and that 3) one or more of the conspirators committed an act in furtherance of the conspiracy, 4) whereby another was injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States." Domokur v. Milton Township Bd of Trustees, No. 4:07CV00247, 2007 U.S. Dist. LEXIS 66710 (N.D. Ohio Sept. 10, 2007) (citations omitted). An additional requirement of a section 1985 action is that the claim must be based on "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators action.  Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); O'Neill v. Grayson County War

Memorial Hospital, 472 F.2d 1140 (6th Cir. 1973) (a section 1985(3) claim "must be founded on a class-based invidious discrimination.").

Although not addressed by the defendants, the plaintiffs' conspiracy claim under 42 U.S.C. §1985(3) must fail under the "intracorporate conspiracy" doctrine, which provides that "a corporation cannot conspire with its own agents or employees." Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 840 (6th Cir. 1994). That is, "if all of the defendants are members of the same collective entity, there are not two separate people to form a conspiracy." Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ., 926 F.2d 505, 510 (6th Cir. 1991). The intracorporate conspiracy doctrine is applicable in cases alleging civil rights conspiracies. Johnson, 40 F.3d at 840.

Having already concluded that there is no genuine issue of fact remaining with regards to the allegation of a conspiracy between the ODA and the egg defendants, the only remaining parties to the alleged conspiracy under section 1985(3) are New Day and Daybreak. There is no question that New Day is the "wholly owned subsidiary" of Daybreak. (See New Day II doc.23 p. 27; New Day II doc. 14 p.9). It is well settled that "wholly-owned subsidiaries of a single parent company are legally incapable of conspiring because a single legal entity cannot conspire with itself." Omega Cable & Communs., Inc. v. Time Warner, Inc., NO. 5:05CV1780, 2006 U.S. Dist. LEXIS 50258 (N.D. Ohio July 24, 2006). Accordingly plaintiffs cannot maintain a claim against the egg defendants under 42 U.S.C. §1985(3).

## IV. CONCLUSION

Based on the foregoing reasons, the defendant's motion for summary judgment (doc. 14) is GRANTED IN PART and DENIED IN PART.  Summary judgment in favor of the New Day

and Daybreak is GRANTED on Counts I, III, IV, V and VI.   Summary judgment is DENIED on

Count II.

      IT IS SO ORDERED.


                                     S/ James L. Graham                
                                     James L. Graham
                                   UNITED STATES DISTRICT COURT

Mar. 31, 2011